# UNITED STATES DISTRICT COURT



CLERK'S OFFICE
A TRUE COPY
Dec 02, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

### EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

A TOTAL OF UP TO $129,557.50 IN FUNDS ON DEPOSIT
IN BMO HARRIS BANK N.A. ACCOUNT ENDING IN #4312
HELD IN THE NAME OF JOHN WHELAN, AND BMO
HARRIS BANK N.A. ACCOUNT ENDING IN #0370 HELD
IN THE NAME OF JOHN WHELAN AND HEATHER WHELAN

Case Number: **20-M-455 (SCD)**

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Jessie Lewis, being duly sworn depose and say:

I am a Task Force Officer assigned to the Drug Enforcement Administration, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, a total of up to $129,557.50 in funds on deposit in BMO Harris Bank N.A. account ending in #4312 held in the name of John Whelan, and BMO Harris Bank N.A. account ending in #0370 held in the name of John Whelan and Heather Whelan, that is civilly forfeitable under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(C) and 984, and criminally forfeitable under 21 U.S.C. § 853, as proceeds of unlawful distribution of controlled substances outside the scope of normal medical practice and not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b), and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

    ✓ Continued on the attached sheet.

    ❑ Delayed notice of _____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

_Jessie Lewis_
Signature of Affiant
Jessie Lewis, DEA

12-2-20 1:20 pm
Date and time issued

at Milwaukee, Wisconsin
City and State

Stephen C. Dries, U.S. Magistrate Judge
Name & Title of Judicial Officer

_Stephen C. Dri_
Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT**

I, Julius Klevinskas, being duly sworn, depose and say as follows:

## I. BACKGROUND, TRAINING, AND EXPERIENCE

1.     I have been employed by the United States Drug Enforcement Administration (DEA) as a Diversion Investigator (DI) since July of 2019. My responsibilities as a DI include the investigation of potential criminal violations involving Title 21, United States Code, and Title 21, Code of Federal Regulations, Part 1300 *et seq.* I am currently assigned as a DI to the DEA Milwaukee District Office (MDO) in West Milwaukee, Wisconsin.  In my capacity as a DI for the DEA, I have conducted and participated in investigations of pharmacies, physicians, and individuals involved in diversion, that is, the unlawful distribution and acquisition of pharmaceutical controlled substances.  I am familiar with the usual methods of investigation, including but not limited to, conducting audits, the questioning of witnesses, the use of informants, and undercover operations.

2.     I am currently participating in an investigation of John Daniel WHELAN, M.D. ("WHELAN") and Tina Marie MONTEZON ("MONTEZON") for their suspected involvement in the unlawful distribution of controlled substances outside the scope of normal medical practice and not for a legitimate medical purpose, and a conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and maintaining drug involved premises in violation of Title 21, United States Code, Section 856(a)(1).

1

3.     According to records from the Wisconsin Department of Safety and Professional Services (DSPS), Medical Examining Board (MEB), WHELAN is a medical doctor licensed to practice medicine in the State of Wisconsin. According to DEA records, WHELAN is also registered with the DEA as a practitioner authorized to dispense Schedule II through V controlled substances pursuant to Title 21, United States Code, Section 822, and has listed his residential address for the DEA registration as 170 West Pioneer Road, Apartment 102, Fond Du Lac, Wisconsin 54935. Investigation in this case has revealed that WHELAN issues prescriptions of controlled substances in exchange for cash on Saturdays out of the residential house of MONTEZON, located at 90 Clinton Street, North Fond Du Lac, Wisconsin 54937. According to records from DSPS, MONTEZON is licensed by Wisconsin as a licensed practical nurse.

4.     This affidavit is made in support of my application for a seizure warrant for a total of $133,623.50 (the Subject Funds). The Subject Funds consist of up to $129,557.50 in funds held in the BMO Harris Bank N.A. account# XX4312 (checking) and BMO Harris Bank N.A. account# XX0370  (savings), as well as $4,066, held in BMO Harris Bank N.A. account# XX5981 (checking) (collectively, the "Subject Accounts"), in the name of John WHELAN. Because, as described below, WHELAN uses accounts XX4312 and XX0370 as essentially one account, I respectfully request the court order a seizure warrant of up to $129,557.50 on deposit in those accounts. Based on the last known balances, this would amount to $15,647.35 from Account XX4312 and $113,910.15 from Account XX0370.

5.     Based on the facts and circumstances set forth below, I submit that there exists probable cause to believe that the Subject Funds in the Subject Accounts are

proceeds of controlled substance sales, and that an amount up to $129,557.50 in funds held in the BMO Harris Bank N.A. account# XX4312 (checking) and BMO Harris Bank N.A. account# XX0370 (savings), as well as $4,066, held in BMO Harris Bank N.A. account# XX5981 (checking) are:

    a. Funds traceable to, and are therefore proceeds of unlawful distribution of controlled substances outside the scope of normal medical practice and not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1) and 846, subject to civil forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(C) and 984, and subject to criminal forfeiture under 18 U.S.C. § 853; and

    b. Subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

6.    The information contained in this affidavit is based upon my own personal knowledge and observations, as well as information I have obtained from other law enforcement personnel, DEA records, and records and information received from other parties, such as pharmacists, all of which I believe to be reliable. In addition, I have received information from citizen witnesses that I believe to be credible because their information generally has been corroborated by independent sources.

## II.    APPLICABLE FORFEITURE STATUTES

7.    Title 21, United States Code, Section 881(a)(6) provides that all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation Title 21, United States Code, Sections 841, 846 or 856, and all proceeds traceable to such an

exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate the illegal activity are subject to forfeiture by the United States.

8.      Title 18, United States Code, Section 981(a)(1)(C), via cross-reference to Title 18, United States Code, Section 1956(c)(7), provides that any property, real or personal, which represents or is derived from proceeds traceable to proceeds of the sale or distribution of a controlled substance, are subject to forfeiture to the United States.

9.      Title 18, United States Code, Section 981(b) provides that any property subject to forfeiture to the United States under Section 981(a) may be seized by the Attorney General of the United States and that such seizures shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.  In turn, Federal Rule of Criminal Procedure 41(d)(1) provides that a magistrate judge must issue a warrant if, after reviewing an affidavit, there exists probable cause to seize the subject property.

10.      Title 18, United States Code, Section 984 provides that a court may order the forfeiture of funds in a bank account into which monies subject to forfeiture have been deposited, without the need to trace the funds currently in the account to the specific deposits that are subject to forfeiture, up to the amount of the funds subject to forfeiture that have been deposited into the account within the past one-year period.

11.      Section 984 (a) provides in part:

(1)  In any forfeiture action *in rem* in which the subject property is cash [or] funds deposited in an account in a financial institution -

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

12. Title 18, United States Code, Section 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

13. Thus, under Section 984, a court may order the forfeiture of monies found in a bank account into which forfeitable deposits had been made, up to the amount of the forfeitable deposits that have been made into the account within the prior one-year period, without the need for tracing the funds to be forfeited to any of the specific forfeitable deposits.

14. Title 21, United States Code, Section 853 provides that any property derived from, or proceeds obtained directly or indirectly as a result of a violation of Title 21 shall be forfeited.

## III. PROBABLE CAUSE

15. Pursuant to Title 21, United States Code, Section 841(a)(1) and Title 21, Code of Federal Regulations, Section 1306.04(a), the distribution of controlled substances is unlawful unless the controlled substances are issued for a legitimate medical purpose by

5

an individual practitioner acting in the usual course of his or her professional practice. The practitioner is responsible for the proper prescribing and dispensing of controlled substances. Based on, among other things, information obtained through confidential sources, an undercover officer, and multiple witness interviews, there is probable cause to believe that WHELAN has prescribed, and continues to prescribe, controlled substances outside the usual course of professional practice and without a legitimate medical purpose.

16. As detailed below, through this investigation, I have learned the following regarding WHELAN's practices at the Clinton Street House:

a. Individuals usually pay $200.00 to $300.00 in cash to obtain prescriptions for controlled substances.

b. Prescriptions are written for large quantities of Suboxone or Subutex, a Schedule III narcotic controlled substance, particularly Suboxone 8/2mg and Suboxone 8mg (usually 60-90 dosage units per month), along with other controlled substance medications that include various stimulants and benzodiazepines, to include, but not limited to, Adderall, Ritalin, and Xanax.

c. MONTEZON typically fills out prescriptions and has WHELAN sign the prescriptions without WHELAN actually seeing the individual receiving the prescription.

d. Patients are often offered the option of picking up prescriptions without seeing WHELAN. When they do so, they are still required to pay the $200.00 to $300.00 fee.

e. Individuals frequently obtain prescriptions from WHELAN without being examined, without submitting a drug test, or without having their vitals (height, weight, blood pressure) taken during their visit.

f. During the period from January 2018 to August 2020, MONTEZON received approximately 31 prescriptions of controlled substances issued by WHELAN. These include prescriptions for Adderall 30mg (stimulant), lorazepam

6

1mg (benzodiazepine), triazolam 0.25mg (benzodiazepine), and Tramadol 50mg (opiate), all of which are controlled substances.

g.      Patients are asked minimal/no questions regarding their medical history and/or drug use prior to being issued controlled substance prescriptions.

h.      Financial records showed that WHELAN deposited approximately $128,623.50 cash and approximately $5,000 in money orders and checks from individuals receiving prescriptions into his BMO Harris Bank N.A. bank accounts for the time period of December 1, 2019, to November 17, 2020.

f.      Financial records showed that various individuals receiving controlled substance prescriptions from WHELAN issued checks and money orders to WHELAN in the amounts of $200.00 and $300.00, which were deposited to the BMO Harris Bank N.A. bank accounts, described above.

17.     Suboxone, according to the website "drugs.com", is a Schedule III controlled substance, generic name buprenorphine/naloxone. Suboxone contains a combination of buprenorphine and naloxone; buprenorphine is an opioid medication, sometimes called a narcotic, and naloxone blocks the effects of opioid medication, including pain relief or feelings of well-being that can lead to opioid abuse. Suboxone is used to treat narcotic (opiate) addiction. This medication may be habit-forming, and misuse can cause addiction.

18.     Subutex, according to the website "drugs.com", is a Schedule III controlled substance, generic name buprenorphine. Subutex is an opioid medication used to treat opioid addiction. Other forms of buprenorphine are used to treat moderate to severe pain, however Subutex sublingual is not for use as a pain medication. Misuse of Subutex can cause addiction, overdose, or death.

19.     Adderall, according to the website "drugs.com", is a Schedule II controlled substance, generic name amphetamine/dextroamphetamine. Adderall is a central

nervous system stimulant that affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Adderall is used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy. Adderall may be habit-forming, and this medicine is a drug of abuse.

20.     Ritalin, according to the website "drugs.com", is a Schedule II controlled substance, generic name methylphenidate, and is a central nervous system stimulant. Ritalin affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Ritalin is used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy. Ritalin may be habit-forming, and this medicine is a drug of abuse.

21.     Xanax, according to the website "drugs.com", is a Schedule IV controlled substance, generic name alprazolam. Xanax is used to treat anxiety disorders and anxiety caused by depression. Xanax is also used to treat panic disorders. Xanax may be habit forming, and misuse can cause addiction.

A.     **JANUARY 2020: INFORMATION OBTAINED FROM MARINETTE COUNTY JAIL**

22.     On January 29, 2020, a Narcotics Investigator at the Marinette County Sheriff's Office contacted DEA and stated that multiple incarcerated individuals at the Marinette County Jail were patients of WHELAN.[1] The Narcotics Investigator explained that a currently incarcerated individual had told him/her and a Marinette County Jail

---

[1] Throughout this affidavit, I refer to the individuals who obtain prescriptions from WHELAN as "patients." Given the circumstances under which WHELAN is operating and the fact that he is simply providing prescriptions in exchange for cash, the individuals to whom WHELAN provides prescriptions for controlled substances cannot legitimately be deemed "patients" of WHELAN. Nevertheless, I use that shorthand here for ease of reference, and not to suggest that WHELAN's operation bore any resemblance to the legitimate practice of medicine.

Nurse that whenever he/she needed a refill on prescriptions, he/she sent a text message to MONTEZON.[2] The incarcerated individual also explained he/she knew of approximately 50 individuals who were getting prescriptions from WHELAN, all of which included a mix of approximately 90 dosage units each of the following controlled and non-controlled substances: Ritalin (methylphenidate), Klonopin (clonazepam) or Xanax (alprazolam), and gabapentin or Lyrica (pregabalin).

23.     The Marinette County Jail Nurse explained he/she had sent WHELAN various requests for medical records of individuals incarcerated at the Marinette County Jail who were receiving prescriptions of controlled substances issued by WHELAN, but had received either only copies of the prescriptions issued by WHELAN without any medical records, or nothing at all. The Marinette County Jail Nurse further explained that the incarcerated individuals had told him/her that some individuals saw WHELAN one time, and future prescriptions were filled without follow-up visits. The incarcerated individuals stated they saw WHELAN on Saturdays, and paid cash for prescriptions.

### B.     FEBRUARY 2020: INTERVIEWS OF INCARCERATED INDIVIDUALS

24.      In February 2020, DEA Investigators interviewed five incarcerated individuals at the Marinette County Jail regarding WHELAN and MONTEZON. The interviewed individuals had previous criminal and non-criminal history, some of which included felonies and drug convictions, and/or had pending charges at the time of the interview.

---

[2] In an effort to conceal and protect the identity of confidential sources of information, as well as individual patients and/or witnesses in this affidavit, I have attempted to use pronouns that do not indicate gender. To the extent that a gender-specific pronoun is used, it does not necessarily refer to the actual gender of the person to whom it refers.

25.     In particular, the interviewed individuals were identified to have had the following convictions: Individual #1 was convicted of drug related felonies and a misdemeanor for possession of controlled substance and possession of illegally obtained prescription, and was convicted of various misdemeanors unrelated to controlled substances. Individual #2 was convicted of misdemeanor for possession of THC, and convicted of various misdemeanors unrelated to controlled substances. Individual #3 was convicted of various misdemeanors, including possession of controlled substances, and was convicted of a felony for bail jumping. Individual #4 was convicted of a felony for possession of methamphetamine. Individual #5 was convicted of a felony related to misstate/conceal facts in food stamp application, as well as some misdemeanors and non-criminal convictions unrelated to controlled substances.

26.     The individuals were not offered anything in exchange for providing the information. The individuals all provided essentially the same information, as detailed below, although some provided more detail than others. Much of the information provided by the individuals interviewed generally has been corroborated by each other, as well as by independent sources, including review of prescription records, financial records, and undercover visits to Clinton Street House, which are described below.

27.     The interviewees stated WHELAN was prescribing controlled substances on Saturdays out of the basement of MONTEZON's residence (Clinton Street House) in exchange for $200.00 to $300.00 cash payment. In particular, WHELAN issued prescriptions for Suboxone, or Subutex, and various other controlled substances, often in combination, and many times without seeing the individuals. Interviewees told

10

investigators that if they saw WHELAN during the visits at the Clinton Street House, it was only for a few minutes prior to being prescribed controlled substances. The interviewees stated they observed MONTEZON write out the prescriptions.

28.     The interviewees stated they often texted MONTEZON to pick up prescriptions without seeing WHELAN. Many told investigators that they traveled from hours away. Interviewees told investigators that they were prescribed controlled substances without a physical or mental exam, without submitting to a drug screening test, and without providing previous medical records. They also stated that they were asked minimal medical questions during the visits with WHELAN, were prescribed controlled substances based on their request for specific controlled substances, and were offered the option of picking up prescriptions from MONTEZON without seeing or interacting with WHELAN.

29.     One of the interviewees explained that he/she received approximately eight (8) different prescriptions of controlled substances every visit (monthly), including multiples of the same controlled substance, but in varying forms, such as extended release. In particular, the individual received prescriptions of Suboxone, Ritalin, gabapentin, Xanax, and Vyvanse. The individual explained that others in town (Marinette, Wisconsin) who received prescriptions of Suboxone from WHELAN were selling it, or portions of it, "on the street." The individual stated that "street price" of Suboxone had dropped from "$40 per strip to $10 per strip" because of WHELAN's prescribing.

### C. FEBRUARY 2020: INFORMATION OBTAINED FROM PHARMACISTS

30.     In February 2020, DEA Investigators interviewed various pharmacists located in the Marinette, Wisconsin area. Multiple pharmacists stated they no longer filled any prescriptions issued by WHELAN due to suspicious prescribing practices, and explained that prescriptions issued by WHELAN consisted mostly of high quantities of Suboxone and ADHD medication, such as Adderall. The pharmacists stated the prescriptions were issued to mostly young individuals from the local area (Marinette, Wisconsin), which is located approximately two (2) hours from the Clinton Street House.

### D. FEBRUARY 2020: REVIEW OF PRESCRIBING RECORDS AND LICENSURE

31.     In February 2020, DEA investigators conducted an initial review of the Wisconsin Prescription Drug Monitoring Program (PDMP) records, which showed that WHELAN typically prescribed a variety of controlled substances, often in combination, to include Suboxone or Subutex and various benzodiazepines and stimulants, including, but not limited to, Xanax (alprazolam), Adderall (amphetamine/dextroamphetamine), and Ritalin (methylphenidate). WHELAN typically prescribed approximately 60 to 90 dosage units of each controlled substance for a 30-day period.

32.     PDMP records showed that WHELAN's prescribing has increased in the past several years. In particular, WHELAN issued approximately 2,500 prescriptions of controlled substances in 2017, approximately 5,200 prescriptions of controlled substances in 2018, and approximately 8,200 prescriptions of controlled substances in 2019. A recent review of the PDMP records showed that WHELAN issued approximately 7,000

prescriptions of controlled substance in 2020 as of October 1, 2020. PDMP records also showed that Suboxone/Subutex, Adderall, and Xanax were among the highest controlled substance medications prescribed by WHELAN. PDMP records also showed that Saturdays were usually the days with the most controlled substance prescriptions issued by WHELAN as compared to other days of the week.

33.     A review of WHELAN's medical licensure showed that on May 21, 2003, WHELAN's State of Wisconsin Medicine and Surgery license was reprimanded by the Wisconsin Medical Examining Board (MEB) after MEB's findings that WHELAN developed a personal and sexual relationship with one of WHELAN's patients, and had resided with that patient from approximately September 2000 to September 2001. WHELAN issued various prescriptions to the individual while he/she was a patient of a psychiatrist, and did so without consulting with the individual's psychiatrist. MEB also found that WHELAN neither created nor maintained any patient health care records regarding the care he provided to the individual.

### E.     JUNE 2020: INTERVIEW WITH CONFIDENTIAL SOURCE #1

34.     On June 5, 2020, a CONFIDENTIAL SOURCE ("CS#1") was interviewed by DEA Investigators regarding MONTEZON and WHELAN. CS#1 has a prior felony conviction for possession of methamphetamine, and at the time of the interview was on probation. CS#1 agreed to assist Investigators in exchange for monetary compensation. CS#1 was attentive and cooperative throughout the investigation. Case agents believe that the information provided by CS#1 is truthful and reliable because the information was verified and corroborated by independent sources, including undercover visits to

13

the Clinton Street House. The only discrepancy found involved CS#1's prescription information. As mentioned below, CS#1 believed he/she received Subutex prescriptions weekly from a doctor in Green Bay, Wisconsin that consisted of 2 to 4mg per day. However, a review of PDMP records showed that CS#1 usually received prescriptions of Subutex 6mg per day.

35.     CS#1 stated he/she last saw WHELAN in March 2019, and has not had any contact with WHELAN since. CS#1's fiancé received controlled substance prescription from WHELAN for approximately two (2) years, and introduced CS#1 to WHELAN. Prior to WHELAN, CS#1 saw a doctor in Green Bay, Wisconsin weekly for Suboxone prescriptions, but CS#1 wanted to find a doctor that prescribed Suboxone for a month's supply. CS#1 believed he/she was prescribed 2 to 4mg of Subutex per day, but WHELAN increased the dosage to 12mg per day. CS#1 explained that WHELAN asked if the 2mg dosage was a good dosage. CS#1 told WHELAN that it was. Despite that, WHELAN increased the dosage to 12mg in the event CS#1 needed to have some to "fall back on." CS#1 explained he/she started using Suboxone in 2014 and was addicted to it, and that it was CS#1's "choice of drug." CS#1 stated the Suboxone gave him/her a "high" or a "buzz," and would get rid of headache-caused pain.

36.     CS#1 stated that CS#1's fiancé always had a substance addiction, which CS#1 suspected was an addiction to pain killers. CS#1 stated CS#1's fiancé started using Suboxone approximately six (6) years ago. CS#1 explained that while on Suboxone, CS#1's fiancé was doing "really good" and would not use other drugs or alcohol. Prior to WHELAN, CS#1's fiancé saw a doctor in Michigan for the Suboxone prescriptions. CS#1

14

explained that he/she thought CS#1's fiancé was first seeing WHELAN at a clinic, but was then seeing WHELAN at the Clinton Street House. CS#1 explained that WHELAN prescribed CS#1's fiancé Suboxone, Adderall, Gabapentin, Xanax, and Trazadone. CS#1 stated CS#1's fiancé did not have attention issues and did not need Adderall; CS#1's fiancé told CS#1 he/she had anxiety from the relationship issues and was prescribed Xanax because of it. CS#1 stated that CS#1's fiancé had body spasms while sleeping and Trazadone helped. CS#1 was unsure why CS#1's fiancé was prescribed Gabapentin. CS#1 believed that CS#1's fiancé was taking these medications more for his/her addiction than for legitimate reasons.

37.     CS#1 stated his/her fiancé called MONTEZON to schedule CS#1's first appointment. CS#1 explained he/she and CS#1's fiancé went to the appointments together. CS#1 stated that the appointments lasted approximately 25 minutes, and CS#1 had to provide his/her personal and insurance information, and previous doctor information for the first appointment. CS#1 explained both he/she and CS#1's fiancé saw WHELAN together for all but one (1) visit. During the visit when CS#1's fiancé was not present, CS#1 stated WHELAN asked him/her if CS#1's fiancé needed any medications to be "upped," and CS#1 picked up prescriptions for CS#1's fiancé. CS#1 stated WHELAN charged $200.00 per person, per visit. However, WHELAN gave CS#1 and CS#1's fiancé a "couple's discount," charging only $300.00 per visit. When CS#1 picked up prescriptions for CS#1's fiancé, CS#1 still had to pay $300.00 for the visit, despite CS#1's fiancé not being there.

38.     CS#1 stated the living room of the Clinton Street House was used as the waiting room for patients and the living room table was used as MONTEZON's desk. CS#1 explained WHELAN's office was in a room in the basement, which had a desk, a fish tank, two (2) chairs, and possibly a couch. CS#1 did not see any medical equipment in WHELAN's office or anywhere else at the Clinton Street House, and stated WHELAN did not conduct any drug tests, vitals check, discuss prior health history, and asked minimal questions regarding CS#1's Suboxone/Subutex use. CS#1 stated that WHELAN made it seem like WHELAN wanted to help patients with getting off drugs with Suboxone, but at the same time was ignoring signs that CS#1's fiancé appeared to be on drugs. CS#1 explained that CS#1's fiancé looked "rough" during the appointments due to drug use, but WHELAN did not address CS#1's fiancé condition nor ask questions regarding drug use. CS#1 believed that WHELAN's motive for writing prescriptions was money.

39.     CS#1 described WHELAN as quiet, short with questions, and stated that WHELAN often asked about personal life matters during the appointments that were not relevant to the prescriptions or doctor visits. Additionally, CS#1 explained WHELAN asked if CS#1 wanted the medication "upped," but never asked about a decrease in medication. CS#1 stated that WHELAN did not discuss counseling or drug addiction meetings during the appointments. CS#1 explained that WHELAN seemed like a "very easy" doctor to get "what you wanted."

### F. JULY 25, 2020: CS#1 AND UC#1 VISIT TO WHELAN

40. On July 25, 2020, an UNDERCOVER OFFICER ("UC #1") and CS#1 visited Clinton Street House for a visit with WHELAN. Prior to this meeting, UC#1 and CS#1 were outfitted with concealed audio and video recording devices (this occurred on every undercover visit described below). CS#1 was able to text MONTEZON and schedule an appointment to see WHELAN. The below information was witnessed by UC#1 and CS#1 during their visit at the Clinton Street House, and was generally corroborated by subsequent review of material generated by their recording devices.

41. Upon arrival to the Clinton Street House, UC#1 and CS#1 knocked on the front door and walked inside the residence. Upon entering the residence, UC#1 and CS#1 walked up a flight of stairs into the living room area and sat on a couch. UC#1 observed several individuals seated in the living room area, which was utilized as a waiting area. UC#1 observed MONTEZON and MONTEZON's daughter Nicole MONTEZON seated at a table in the living room with other individuals who appeared to be waiting for appointments with WHELAN, or getting prescriptions. UC#1 also observed MONTEZON's husband, Alex MONTEZON, walking around the living room and kitchen area of the residence. UC#1 noticed two cameras in the living room near the table where MONTEZON and Nicole MONTEZON were working.

42. UC#1 observed that every person who was being checked in by MONTEZON and Nicole MONTEZON paid cash for their visits; Nicole MONTEZON collected the cash and MONTEZON finished checking them in. While waiting to be checked in by MONTEZON, UC#1 overheard MONTEZON explain loudly to another

individual that the "FDA" was investigating them and that they had to write out prescriptions for lower dosage amounts. UC#1 overheard MONTEZON and Nicole MONTEZON discuss that WHELAN was down in the basement and they were not sure what WHELAN was doing.

43. After a period of time, Nicole MONTEZON asked CS#1 his/her name and proceeded to look through an open file cabinet, but was not able to find CS#1's file. UC#1 overheard Alex MONTEZON tell Nicole MONTEZON that files older than six months were located in the basement, after which Nicole MONTEZON walked downstairs and retrieved CS#1's file. CS#1 then took a seat at the living room table next to MONTEZON, and paid Nicole MONTEZON $200.00. MONTEZON wrote a prescription for 90 count of Subutex 8mg (24mg/day), however it was not clear whether MONTEZON signed the prescription, or if the prescription was signed by WHELAN as UC#1 observed MONTEZON walk downstairs to the basement during the visit. CS#1 had not seen WHELAN or received a prescription of Subutex from WHELAN since March 2019, and the last prescription CS#1 received from WHELAN in March 2019 was for 180 count of Subutex 2mg (12mg/day). CS#1 was not asked questions related to CS#1's medical health and there was no medical exam or drug test performed. CS#1 did not interact with WHELAN during the visit.

44. CS#1 attempted to get UC#1 signed up as a new patient, however CS#1 was told that WHELAN was not seeing any new patients that day. However, UC#1 and CS#1 were able to schedule a follow-up appointment with WHELAN for the following month.

18

### G.      AUGUST 22, 2020: CS#1 AND UC#1 VISIT TO WHELAN

45.      On August 22, 2020, UC#1 and CS#1 went to the Clinton Street House for a second time. UC#1 used his/her undercover fictitious driver's license with a fictitious name for the operation. The below information was witnessed by UC#1 and CS#1 during their visit, and was generally corroborated by subsequent review of material generated by their recording devices.

46.      Upon entering the residence, UC#1 and CS#1 walked up a flight of stairs into the living room and sat on a couch. UC#1 observed several individuals in the living room area, which was utilized as a waiting area for the patients. UC#1 observed MONTEZON and another female seated at a table in the living room with patients. UC#1 was able to positively identify the female as Samantha PHILLIPS from observing a picture of PHILLIPS after the visit. Investigators were able to identify that PHILLIPS and WHELAN were related, although the exact relationship between WHELAN and PHILLIPS is unknown at this time. UC#1 also observed Alex MONTEZON inside of the residence.

47.      After waiting for a period of time, MONTEZON asked who the next patient was and CS#1 asked if UC#1 and CS#1 could be seen together, to which MONTEZON responded in the affirmative. UC#1 and CS#1 both walked over to the living room table and sat down next to PHILLIPS and MONTEZON. While UC#1 and CS#1 were seated at the table, CS#1 paid PHILLIPS $200.00 and PHILLIPS issued CS#1 a receipt for the payment. UC#1 handed his/her undercover fictitious driver's license to PHILLIPS,

19

which was then handed to MONTEZON. MONTEZON appeared to make a copy of UC#1's fictitious driver's license, and was using a laptop computer during the visit.

48. MONTEZON had UC#1's undercover fictitious driver's license to use to complete the paperwork. MONTEZON started out by asking UC#1 his/her name, date of birth, and current address. Next, MONTEZON asked what medication UC#1 was using. UC#1 replied to MONTEZON that UC#1 was not using anything that was prescribed to UC#1 by a doctor. MONTEZON asked UC#1 what UC#1 was "buying off the street." UC#1 replied that he/she was buying and using Suboxone 8mg films, as well as Adderall. UC#1 told MONTEZON he/she used 10's and 30's, referring to the milligrams for the Adderall, as well as "whatever I can get my hand on" to help UC#1 focus at work. MONTEZON and UC#1 discussed the different milligrams of Adderall and the number of times a day that UC#1 would take the Adderall. MONTEZON appeared to pre-fill WHELAN's prescription pad (a blank prescription that contained WHELAN's pre-printed information, such as name and address) with the controlled substances that UC#1 told MONTEZON he/she was buying "off the street." MONTEZON asked UC#1 if UC#1 had any medical problems, if UC#1 had any allergies, and if UC#1 had medical insurance. UC#1 told MONTEZON that UC#1 gets paid cash, that UC#1 did not have health insurance, and that UC#1 would want whatever is cheaper (referring to the medication), and also told MONTEZON that UC#1 did not want to keep buying stuff (controlled substances) "off the street." MONTEZON replied that made sense because issuing the prescriptions to UC#1 was legal and buying "off the

street" was not. MONTEZON told UC#1 and CS#1 that she was going to go downstairs to check to see how WHELAN was doing.

49.     As UC#1 was speaking with MONTEZON, an unidentified individual started a conversation with MONTEZON about his/her prescriptions and told MONTEZON which prescriptions he/she and another individual wanted to receive for the next couple of months so they would not have to see WHELAN. The unidentified individual also told MONTEZON that he/she wanted to "go up" on his/her Suboxone prescription because he/she was giving another individual some of his/hers. MONTEZON told the individual not to tell her that, but appeared to write down the prescriptions requested by the unidentified individual.

50.     After the unidentified individual was done speaking with MONTEZON, UC#1 observed MONTEZON fill out two (2) prescriptions for UC#1: 60 count of Adderall 30mg and 90 count of Subutex 8mg, both for 30 day supply, which were the exact controlled substances UC#1 had told MONTEZON he/she was buying illegally, "off the street." MONTEZON told UC#1 not to take the Adderall close to bedtime. MONTEZON told UC#1 she had to write out separate prescriptions for different medications, appeared to use her cellphone to look something up for the prescriptions, and explained that MONTEZON had to write UC#1's date of birth and address on the prescriptions for the pharmacy. MONTEZON told UC#1 that the pharmacy would want to see UC#1's driver's license. UC#1 and CS#1 then sat back down on the couch, waiting to be seen by WHELAN.

51.     While sitting on the couch, UC#1 stood up and walked over to PHILLIPS. UC#1 asked PHILLIPS how much UC#1 needed to pay for the visit. PHILLIPS replied that new patients had to pay $300.00 in cash for their first visit and then subsequent visits would be $200.00 in cash, after which UC#1 handed PHILLIPS $300.00. After a period of time, MONTEZON told UC#1 and CS#1 they could go see WHELAN in the basement.

52.     Upon entering the basement, WHELAN told the UC#1 and CS#1 to have a seat in front of WHELAN's desk. WHELAN spoke out loud that he didn't see UC#1's and CS#1's charts, so he called MONTEZON using his cellphone. UC#1 could hear MONTEZON tell WHELAN that he would only have one chart due to UC#1 being a new patient and that MONTEZON would complete UC#1's chart after the visit.

53.     After the call, WHELAN asked CS#1 some questions, such as, how did CS#1 get on the Subutex, how CS#1 was sleeping, and where CS#1 worked. While CS#1 was speaking with WHELAN, MONTEZON came downstairs with multiple prescriptions, unrelated to UC#1 and CS#1, for WHELAN to sign. MONTEZON left the basement with the signed prescription and WHELAN finished talking with CS#1. UC#1 observed that CS#1's prescription was already filled out and that WHELAN just had to sign the prescription, after which WHELAN handed the prescriptions to CS#1.

54.     After WHELAN finished asking CS#1 questions, he started to ask UC#1 questions. WHELAN confirmed that UC#1 was referred by CS#1. WHELAN then asked if UC#'1's sleep was ok, if UC#1 was going through withdrawal, if UC#1 was a student or worked, if UC#1 had kids or hobbies, and if UC#1 heard voices or saw things. After

WHELAN was done asking UC#1 these questions, UC#1 observed WHELAN sign both of the prescriptions for Subutex and Adderall. WHELAN then handed the signed prescriptions to UC#1. During the visit, there was no medical exam or drug test performed prior to the issuance of the controlled substance prescriptions to UC#1 and CS#1, and WHELAN asked minimal/no questions regarding the controlled substances, previous medical history, or drug use. UC#1 and CS#1 were able to schedule a follow-up appointment with WHELAN for the following month.

**H.     SEPTEMBER 19, 2020: CS#1 AND UC#1 VISIT TO WHELAN**

55.     On September 19, 2020, UC#1 and CS#1 went to the Clinton Street House for a third scheduled visit with WHELAN. The below information was witnessed by law enforcement personnel and UC#1 and CS#1 during their visit, and was generally corroborated by subsequent review of material generated by their recording devices.

56.     Upon entering the Clinton Street House, UC#1 and CS#1 walked up a flight of stairs into the living room. UC#1 sat on a couch in the living room, which was utilized as the waiting area, and CS#1 sat at the living room table next to an unidentified individual, who appeared to working with MONTEZON and/or WHELAN. UC#1 observed Alex MONTEZON and one other individual in the living room area. After a period of time, UC#1 observed MONTEZON walk upstairs from the basement. MONTEZON then interacted with CS#1 and the patient in the living room area. CS#1 asked MONTEZON if he/she could get on Adderall, to which MONTEZON replied that CS#1 could not receive Adderall because CS#1 had state insurance. MONTEZON stated that CS#1 first had to do methylphenidate for two months, Vyvanse for two months, and

23

then do the prior authorization for Adderall. MONTEZON then asked CS#1 if he/she wanted to do methylphenidate, to which CS#1 responded in the affirmative. CS#1 then paid the unidentified individual $200.00.

57.     CS#1 asked MONTEZON if UC#1 and CS#1 could go downstairs together, to which MONTEZON asked CS#1 if UC#1 and CS#1 wanted to see the doctor, or if they just wanted WHELAN to sign the prescriptions. CS#1 stated UC#1 and CS#1 wanted to see the doctor.

58.     MONTEZON then interacted with UC#1 and asked his/her name and date of birth. UC#1 asked MONTEZON if he/she could get something to help UC#1 relax, like Xanax. MONTEZON stated that if UC#1 was on Suboxone UC#1 would not be able to receive a prescription for Xanax, or other benzodiazepines, and explained that it wasn't their decision, but rather something that came down from the government.

59.     After a period of waiting, UC#1 and CS#1 were told by MONTEZON that they could see WHELAN (in the basement). UC#1 and CS#1 walked downstairs and sat down in front of WHELAN's desk. WHELAN asked if CS#1 wanted to change anything (referring to controlled substance prescriptions), to which CS#1 responded he/she wanted to receive a prescription of Adderall. WHELAN explained that in order for CS#1 to receive a prescription of Adderall, CS#1 would need to receive a prescription of Ritalin, then Vyvanse (Schedule II stimulant) if Ritalin didn't work, and then CS#1 would be able to receive a prescription of Adderall. WHELAN explained that "they" (the State) makes the patients go through that process, but eventually the patient can receive Adderall.

24

60.     WHELAN asked UC#1 if he/she had to go through the same, to which UC#1 explained he/she wanted to get Xanax. WHELAN stated that if UC#1 was on Suboxone, he/she couldn't get Xanax because of a state regulation, and explained that WHELAN had to follow the rules. WHELAN also stated that insurance companies had their own rules, and without private insurance, the State and pharmacists wouldn't allow it. WHELAN handed UC#1 an envelope with UC#1's fictitious name written on it, which contained prescriptions for 60 count of Adderall 30mg tablets and 90 count of Suboxone 8/2mg films.

61.     WHELAN asked CS#1 what he/she did for work, to which CS#1 responded that he/she worked first shift at a nursing home, but stated CS#1 may work different shifts if the nursing home was understaffed. WHELAN explained that working different shifts could be a reason for Adderall. Additionally, WHELAN explained that Adderall is usually authorized if CS#1 worked as a Certified Nursing Assistant (CNA) or worked different shifts. WHELAN handed CS#1 an envelope with CS#1's name written on it, which contained prescriptions for 40 count of Methylphenidate 20mg tablets and 90 count of Suboxone 8/2mg films.

62.     During the visit with WHELAN, there was no medical exam or drug test performed, and minimal/no medical questions were asked prior to the issuance of the controlled substance prescriptions to UC#1 and CS#1. UC#1 and CS#1 were able to schedule a follow-up appointment with WHELAN for the following month.

## I. OCTOBER 17, 2020: UC#1 VISIT TO WHELAN

63.     On October 17, 2020, UC#1 went to the Clinton Street House for a fourth scheduled visit with WHELAN. During the prior visit, UC#1 and CS#1 scheduled a follow-up visit for October 17, 2020, however only UC#1 was present for the visit. The below information was witnessed by law enforcement personnel and UC#1 during the visit, and was generally corroborated by subsequent review of material generated by the recording devices.

64.     Upon entering the Clinton Street House UC#1 walked up a flight of stairs into the living room, which was used as the waiting area. UC#1 observed several individuals inside of the residence. UC#1 observed Alex MONTEZON standing in the kitchen and MONTEZON, holding a baby, seated at the living room table. UC#1 also observed Samantha PHILLIPS and the same unidentified individual from the September 19, 2020, visit also seated at the living room table. UC#1 sat at the table with MONTEZON, PHILLIPS, and the unidentified individual. UC#1 observed MONTEZON talking on her cellphone and UC#1 asked MONTEZON if UC#1 could pick-up CS#1's prescriptions. UC#1 explained to MONTEZON that CS#1 was not able to make it to the scheduled visit and stated that UC#1 would pay for CS#1's prescriptions.

65.     UC#1 also spoke with PHILLIPS and provided PHILLIPS with his/her fictitious name and date of birth. PHILLIPS showed UC#1 prescriptions for UC#1 and CS#1: 90 count of Suboxone 8/2mg films and 60 count of Methylphenidate 20mg tablets for CS#1, and 90 count of Suboxone 8/2mg films and 60 count of Adderall 30mg tablets for UC#1. UC#1 observed that the prescriptions shown were filled out and signed. UC#1

26

paid the unidentified individual sitting at the table $400.00 for the prescriptions ($200.00 each for UC#1 and CS#1) and UC#1 received two receipts for the payment. PHILLIPS handed UC#1 two envelopes with CS#1's and UC#1's names written on them, which contained the prescriptions for CS#1 and UC#1. UC#1 was able to schedule a follow-up visit for UC#1 and CS#1 in November.

66. The scheduled visit lasted approximately five minutes, and UC#1 did not interact with WHELAN. During the visit, there was no medical exam or drug test performed, and no medical questions were asked prior to the issuance of the controlled substance prescriptions. Additionally, the Methylphenidate prescription (from September 19, 2020, visit) for CS#1 was increased from 40 count to 60 count, even though CS#1 did not interact with WHELAN and was not present during the visit.

## J.     REVIEW OF FINANCIAL INFORMATION

67. A review of financial records obtained from BMO Harris Bank N.A. showed that WHELAN has three open accounts at BMO Harris Bank N.A.; a checking account, number XX4312, in the name of John WHELAN, a savings account, number XX0370 , in the name of John WHELAN and Heather WHELAN, and a checking account, number XX5981, in the name of John WHELAN and Samantha PHILLIPS. The financial records showed that WHELAN deposited cash into the both of the BMO Harris Bank checking accounts, and also deposited money orders and checks into the checking account, number XX4312. Additionally, the financial records showed that WHELAN periodically transferred money into the savings account. The only other source of income deposited

into the Subject Accounts were checks from the AFFILIATED COUNSELING CENTER, INC (referred to as "AFFILIATED" from hereinafter).

68.     Review of financial records showed that approximately $124,557.50 cash was deposited into WHELAN's BMO Harris Bank N.A. checking account XX4312 for the time period of December 1, 2019, through November 17, 2020. The deposits were typically made on a weekly basis, usually on Mondays or Tuesdays. Based on my training and experience, and the investigation to date, I believe these deposits were proceeds that WHELAN acquired while prescribing controlled substances in violation of 21 U.SC. § 841 at the Clinton Street House. The following chart show the dates and amounts of those deposits.

**BMO CHECKING XX4312**

| DATE | AMOUNT |
|------|--------|
| 12/2/2019 (Monday) | $2,605 |
| 12/3/2019 (Tuesday) | $835 |
| 12/9/2019 (Monday) | $2,950 |
| 12/10/2019 (Tuesday) | $750 |
| 12/16/209 (Monday) | $2,050 |
| 12/17/2019 (Tuesday) | $987 |
| 12/23/2019 (Monday) | $3,370 |
| 12/30/2019 (Monday) | $2,243 |
| 1/2/2020 (Thursday) | $580 |
| 1/6/2020 (Monday) | $1,330 |
| 1/8/2020 (Wednesday) | $2,870 |
| 1/13/2020 (Monday) | $3,100 |
| 1/14/2020 (Tuesday) | $480 |
| 1/21/2020 (Tuesday) | $3,705 |
| 1/30/2020 (Thursday) | $700 |
| 2/18/2020 (Tuesday) | $8,167.50 |
| 2/24/2020 (Monday) | $3,250 |
| 2/25/2020 (Tuesday) | $1,500 |

28

| | |
|---|---|
| 3/11/2020 (Wednesday) | $3,207 |
| 3/16/2020 (Monday) | $4,625 |
| 3/24/2020 (Tuesday) | $3,810 |
| 3/30/2020 (Monday) | $3,390 |
| 4/3/2020 (Thursday) | $1,600 |
| 4/7/2020 (Tuesday) | $2,515 |
| 4/14/2020 (Tuesday) | $4,650 |
| 4/21/2020 (Tuesday) | $4,499 |
| 4/28/2020 (Tuesday) | $4,672 |
| 5/8/2020 (Friday) | $3,355 |
| 5/12/2020 (Tuesday) | $3,430 |
| 5/19/2020 (Tuesday) | $3,610 |
| 5/27/2020 (Wednesday) | $4,270 |
| 6/4/2020 (Thursday) | $3,040 |
| 6/9/2020 (Tuesday) | $4,237 |
| 6/16/2020 (Tuesday) | $4,165 |
| 6/24/2020 (Wednesday) | $3,560 |
| 7/7/2020 (Tuesday) | $2,710 |
| 7/16/2020 (Thursday) | $3,290 |
| 7/24/2020 (Friday) | $5,240 |
| 7/28/2020 (Tuesday) | $2,930 |
| 8/4/2020 (Tuesday) | $5,700 |
| 8/8/2020 (Saturday) | $160 |
| 8/26/2020 (Wednesday) | $80 |
| 9/22/2020 (Tuesday) | $340 |
| **TOTAL** | **$124,557.50** |

69.     In addition, records obtained from BMO Harris Bank N.A. showed that WHELAN deposited 16 checks or money orders totaling $5,000 into his checking account XX4312 between December 1, 2019 and November 17, 2020. The majority of these checks and money orders were written by, or issued from, individuals that were identified through the review of PDMP records as having received prescriptions of controlled substances issued by WHELAN on Saturdays. The only exceptions were two money orders, in the amount of $500 and $200, which did not include identifying information for the person writing the checks. The amounts of all the checks and money orders ranged

29

between $100 and $500. Several had notations such as "doctor," "Doc Appt.," or "Dr. Whelan's Office" in the memo line. Based on my training and experience, and investigation conducted to date, I believe that these check and money order deposits were proceeds that WHELAN acquired while prescribing controlled substances in violation of 21 U.S.C. § 841 at the Clinton Street House.

70.     During the same time period, between December 1, 2019 and November 17, 2020, WHELAN made between frequent, mostly monthly or bi-monthly, transfers of funds from between his checking account XX4312 and savings account XX0370 . These transfers ranged in amounts from $1,999.000 to $15,000. For example, on January 23, 2020 WHELAN transferred $15,000 from checking to savings. He then made a series of transfers totaling approximately $56,589.60 back to the checking account between January 31, 2020 and March 9, 2020. On March 25, 2020, WHELAN transferred another $15,000 from checking to savings. He followed that by a $9,999.99 transfer on April 8, 2020, and a series of additional large money transfers from checking to savings on April 22, April 30, May 11, May 29, June 15, June 25, and July 17. There were no other sources of income into this savings account other than the funds transferred in from the checking account.

71.     Review of financial records showed that approximately $4,066 cash was deposited into WHELAN's BMO Harris Bank N.A. checking account XX5981 for the time period of May 28, 2020 to July 1, 2020. Although this account is held jointly with Samantha PHILLIPS, these deposits appear to be made by WHELAN and there is no evidence of any source of cash income for WHELAN or PHILLIPS other than the

30

unlawful prescribing described herein. The following chart shows the dates and amounts of those deposits.

**BMO CHECKING XX5981**

| DATE | AMOUNT |
|------|--------|
| 5/28/2020 | $1,580 |
| 6/8/2020 | $1,321 |
| 7/1/2020 | $1,165 |
| **TOTAL** | **$4,066** |

72.     In addition, records obtained from BMO Harris Bank N.A. showed that WHELAN received and deposited payroll checks from AFFILIATED, located at 1807 North Center Street, Beaver Dam, Wisconsin 53916. Through this investigation it was identified that WHELAN was an employee of AFFILIATED.

73.     Investigators were not able to identify any other sources of income. This investigation also did not disclose evidence that the cash, money order, and check deposits were made by, or from funds owned by, Heather WHELAN or Samantha PHILLIPS.

74.     Thus, it is believed that WHELAN's deposits of cash and checks totaling approximately $129,557.50 into Account XX4312, and transferred between that account and savings account XX0370 , for the time period of December 1, 2019, through November 17, 2020, represent proceeds derived from WHELAN's distribution of controlled substance prescriptions in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and maintaining drug involved premises in violation of Title 21, United States Code, Section 856(a)(1).

75.     It is also believed that WHELAN's deposits of cash totaling $4,066 into Account XX5981 for the time period of May 28, 2020 to July 1, 2020, represent proceeds derived from WHELAN's distribution of controlled substance prescriptions in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and maintaining drug involved premises in violation of Title 21, United States Code, Section 856(a)(1).

76.     As of October 11, 2020, the balance in BMO Harris Bank N.A. account# XX4312 (checking) was $15,647.35. As of October 12, 2020, the balance in BMO Harris Bank N.A. account# XX0370 (savings) was $125,472.00. As of October 10, 2020, the balance in BMO Harris Bank N.A. account # XX5981 (checking) was $873.42.

## IV.    CONCLUSION

77.     Based on aforementioned factual information, I respectfully submit that there is probable cause to believe that $129,557.50 of funds in the BMO Harris Bank N.A. account# XX4312 (checking) and BMO Harris Bank N.A. account# XX0370 (savings), in the name of John WHELAN, which were deposited into those accounts for the period of December 1, 2019, through November 17, 2020, represent proceeds derived from John WHELAN's distribution of controlled substance prescriptions in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and maintaining drug involved premises in violation of Title 21, United States Code, Section 856(a)(1), and are therefore subject to civil forfeiture to the United States under Title 21, United States Code, Section 881(a)(6) and Title 18, United States Code, Sections 981(a)(1)(C) and 984, and subject to criminal forfeiture to the United States under Title 18, United States Code, Section 853.

78. Based on aforementioned factual information, I respectfully submit that there is probable cause to believe that $4,066 of funds in BMO Harris Bank N.A. account # XX5981 (checking) in the name of John WHELAN and Samantha PHILLIPS, which were deposited in to that account for the period of May 28, 2020 to July 1, 2020, represent proceeds derived from John WHELAN's and Samantha PHILLIPS's distribution of controlled substance prescriptions in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and maintaining drug involved premises in violation of Title 21, United States Code, Section 856(a)(1), and are therefore subject to civil forfeiture to the United States under Title 21, United States Code, Section 881(a)(6) and Title 18, United States Code, Sections 981(a)(1)(C) and 984, and subject to criminal forfeiture to the United States under Title 18, United States Code, Section 853.

79. For these reasons, I respectfully request that the Court issue a warrant authorizing the seizure of up to $129,557.50 of funds now on deposit in BMO Harris Bank N.A. account# XX4312 (checking) and BMO Harris Bank N.A. account# XX0370 (savings). Given the last known balances, I respectfully request that the Court issue a warrant that authorizes the seizure of all of funds in Account XX4312, which as of October 11, 2020, was $15,647.35, and the remainder making up the total of $129,557.50 from Account 0370, which would be $113,910.15 based on last known balances.

80. I also respectfully request the seizure of up to $4,066 of funds now on deposit BMO Harris Bank N.A. account# XX5981 (checking).

I swear under penalty of perjury that the foregoing is true and correct.

Julius Klevinskas
Diversion Investigator, Drug Enforcement Administration

Sworn by the affiant in accordance with the requirements
of Fed. R. Crim. P. 4.1 by telephone on this 2nd day of December, 2020.

STEPHEN C. DRIES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF WISCONSIN

34